[Cite as *State v. Richmond*, 2011-Ohio-6807.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE   COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 2011-CA-17 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 10-CRB-2012 |
| v. | : | |
| | : | |
| JUSTIN RICHMOND | : | (Criminal Appeal from |
| | : |  Xenia Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 30th day of December, 2011.

. . . . . . . . . . .

RONALD LEWIS, Atty. Reg. #0061980, Xenia Municipal Prosecutor's Office, 101 N. Detroit Street, Xenia, Ohio 45385
          Attorney for Plaintiff-Appellee

DAVID R. MILES, Atty. Reg. #0013841, 125 West Main Street, Suite 201, Fairborn, Ohio 45324
          Attorney for Defendant-Appellant

. . . . . . . . . . . .

FAIN, J.

{¶ 1}   Defendant-appellant Justin Richmond appeals from his conviction and sentence for Domestic Violence and Assault, which were merged for sentencing purposes, following a jury trial.   Richmond contends that his conviction is against the manifest weight of the evidence.   We conclude that a reasonable jury could decide to credit the victim's statements,

made shortly after her injury to various persons, that her injury was sustained as a result of Richmond's having hit her in the head with a cell-phone; and could reasonably decide not to credit her trial testimony exculpating Richmond.

{¶ 2} Richmond next argues that his trial counsel was ineffective. We conclude that his trial counsel was not ineffective. Defense counsel's voir dire, while brief, was not constitutionally ineffective. Counsel's strategic decision to leave on the jury a former police officer with experience in domestic violence cases was not constitutionally ineffective. Counsel had engaged the juror in a brief colloquy, and may have determined that he would make a better juror than someone who would advance onto the jury, or become an alternate juror, as a result of a peremptory challenge to the former police officer. Because some of the victim's out-of-court statements were likely to be admitted as excited utterances or statements made for purposes of medical diagnosis and treatment, it was not ineffective for counsel to make a strategic decision to let them all come in and have the victim explain, in her trial testimony, why she had falsely accused Richmond of having struck her. The victim's prior inconsistent statement was properly used by the State on cross-examination to impeach her testimony on behalf of Richmond; therefore, trial counsel was not ineffective for not having objected thereto. The prosecutor's comment, in closing argument, concerning Richmond's not having accompanied the victim to the hospital, was not improper. The testimony of the victim, herself, supported a reasonable conclusion that Richmond did not go with her to the hospital. Therefore, defense counsel was not ineffective for having failed to object to this line of argument.

{¶ 3} Richmond next contends that the trial court erred by failing to merge his

Assault and Domestic Violence convictions. The convictions were merged "for sentencing purposes," and only one sentence was imposed. This is all that is required under *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2. Although the State did not elect which conviction should survive merger, Richmond does not assign this failure as error. Nevertheless, we will remand this cause for the State to elect, and for the trial court to recognize, upon which of the two convictions Richmond has been sentenced.

{¶ 4} Finally, Richmond contends that the trial court abused its discretion by imposing a sentence of 180 days in jail and a $500 fine. We conclude that this sentence was not unreasonable in view of the nature of the injury inflicted and Richmond's prior convictions for multiple offenses, including domestic violence, assault, and child endangering. The fact that Richmond was offered (but rejected) a plea bargain that would have involved suspended jail time does not render the sentence imposed unreasonable. Because the victim had recanted and was going to testify for the defense, the State had an incentive to offer Richmond an advantageous plea bargain. Most plea bargains involve some concession on the State's part in exchange for the certainty of a conviction, with a reciprocal abandonment by the defendant of the possibility of an acquittal in exchange for more lenient treatment.

{¶ 5} Because we reject all of Richmond's arguments, the judgment of the trial court is Affirmed.

## I. Richmond's Girlfriend Tells Others Richmond Hit Her
## in the Head with a Cell-phone, But Recants at Trial.

{¶ 6} Nicole Keeton, the victim in this case, is the mother of Richmond's children, one of whom was born after the trial in this case. She was Richmond's girlfriend at the time

of the alleged assault. Jerri Carmen, Abby Moore (Carmen's girlfriend and Keeton's cousin), Keeton and Richmond were at the Ramada Inn (formerly the Holiday Inn) in Xenia one night in August, 2010, for karaoke night. They had been at Keeton's house earlier. It appears that at least some of the four had had some alcoholic beverages at Keeton's house, and that all except Moore, who was only 19, had some alcohol at the Ramada. Carmen could not recall if Keeton had had alcohol at the house; Moore testified that Keeton had been drinking alcoholic beverages at the house, and was "drunk."

{¶ 7} Carmen testified that Keeton and Richmond had been "bickering" at the Ramada, because Richmond wanted to leave, while Keeton wanted to stay. Moore, who left the Ramada before Keeton and Richmond went outside, testified that they had not been arguing around her.

{¶ 8} After Moore left the Ramada for a few minutes to get some money from her home, which was nearby, Keeton and Richmond were outside in the parking lot. About ten minutes after Moore left, Keeton called Moore on her cell phone, "screaming and crying and hollering and talking about Justin, and saying Justin's crazy * * * ." By the time Moore returned to the Ramada, about five minutes later, Keeton was inside "with blood all over her face." According to Moore, Keeton was hysterical, screaming and crying. Keeton told Moore that Richmond had hit her in the head with a cell phone.

{¶ 9} Carmen testified that when Keeton came back inside the Ramada, she was crying and screaming, and was very emotional. He said that she was clear in reporting that it was Richmond who had hit her.

{¶ 10} Dallas Dean Hanson, who was working as a desk clerk at the Ramada that

night, testified that he saw Keeton return to the Ramada with a gash on her forehead. He said that Keeton was crying and hysterical, very upset. He said that she said that she had been hit in the head by her boyfriend with her cell phone.

{¶ 11} Ben Boedecker, a paramedic with the Xenia Fire Department, reported to the scene. He identified two photographs of Keeton, depicting her injury, which were admitted in evidence. Upon refreshing his recollection with his report, he testified that Keeton had told him that she had been hit on the head by her boyfriend with a cell phone. Boedecker took her vital signs and recommended that she go to the hospital to have her laceration stitched.

{¶ 12} Matthew Cvitkovich, a Xenia police officer, testified that he saw Keeton when he reported to the scene. He identified the two photographs depicting Keeton's injury. He testified that she told him that her live-in boyfriend had assaulted her with a cell phone. He testified that Keeton "was adamant about requesting charges," and also wanted a protection order.

{¶ 13} Keeton testified on Richmond's behalf, and was the sole defense witness. She testified that she had become "very much intoxicated" at her house before they went to the Ramada, and that she drank more at the Ramada. She testified that she and Richmond were getting along very well. She testified that in the Ramada parking lot she "was yelling and cursing about something."

{¶ 14} Keeton testified that she and Richmond wound up in a K-Mart parking lot, where they encountered "two guys that obviously knew" Richmond. According to her trial testimony, there was "a big argument" that resulted in "a physical altercation" with Richmond, ending up with her "getting pushed out of the way." As a result, Keeton fell and hit what she

believed was a parking sign, causing the injury to her head.

{¶ 15} Keeton denied that Richmond had hit her. She could not recall having told anyone that Richmond hit her. When asked to explain why she might have told people that Richmond hit her, she testified: "I believe that once I had gotten up off the ground and walked back to the Ramada that he was like – his name was the only thing on my mind."

{¶ 16} Keeton described her state of mind as: "Just obliverated (sic). I was out of my mind, drunk." When asked whether this was "a very emotional moment for you," Keeton responded in the affirmative.

{¶ 17} When Keeton was asked about having requested a protection order and that charges be brought against Richmond, she testified: "I believe I was coerced to do that by a friend who was at the hospital with me." She did not identify the friend.

{¶ 18} Keeton testified that she was "together with" Richmond, and that she intended to stay with him. She testified that she was pregnant with Richmond's child, and that they had another child. She responded affirmatively when asked, "You'd do anything to protect him, correct?"

{¶ 19} Following a jury trial, Richmond was convicted of Assault and Domestic Violence. Both orally at the sentencing hearing, and in its judgment entry, the trial court stated that: "The offenses merge for sentencing purposes." Richmond was fined $500 and sentenced to 180 days in jail. From his conviction and sentence, Richmond appeals.

## II. Richmond's Conviction Is Not Against the Manifest Weight of the Evidence.

{¶ 20} Richmond's First Assignment of Error is as follows:

{¶ 21} "THE MANIFEST WEIGHT OF THE EVIDENCE DOES NOT SUPPORT

APPELLANT'S CONVICTIONS FOR ASSAULT AND DOMESTIC VIOLENCE."

{¶ 22} The manifest-weight-of-the-evidence standard of appellate review is set forth in

*State v. Thompkins* (1997), 78 Ohio St.3d 380, 387:

> Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. [*State v.* ] *Robinson,* supra, 162 Ohio St. [486] at 487, 55 O.O. at 388–389, 124 N.E.2d at 149. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*" (Emphasis added.) Black's [Law Dictionary (6 Ed.1990)], supra, at 1594.
>
> When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a " 'thirteenth juror' " and disagrees with the factfinder's resolution of the conflicting testimony. *Tibbs* [*v. Florida* (1982)], 457 U.S. [31] at 42, 102 S.Ct. [1211] at 2218, 72 L.Ed.2d [652] at 661. See, also, *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720–721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.").

{¶ 23} *State v. Thompkins* involved weighing competing inferences. Where conflicting testimony is involved, we have expanded upon *Thompkins* in *State v. Lawson* (August 22, 1997), 2nd Dist. Montgomery No. 16288:

> Because the factfinder, be it the jury or, as in this case, the trial judge, has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the

record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion. Therefore, although this distinction is not set forth in *Thompkins*, supra, we conclude that a decision by a factfinder as to which testimony to credit, and to what extent, is a decision that is entitled to greater deference than the decision as to how much logical force to assign an inference suggested by that evidence – in short, how persuasive it is.

{¶ 24} Richmond's argument that his conviction is against the manifest weight of the evidence is that Keeton's in-court testimony manifestly outweighs her hearsay statements that Richmond hit her. We do not find this argument persuasive. Keeton's consistent account of her injuries minutes after receiving them occurred while she was in an emotional state that reduced her tendency to reflect upon the consequences of making her statements – i.e., they were excited utterances. But her in-court testimony occurred after she had had the opportunity to reflect upon the effect of Richmond's conviction upon her relationship with him. She admitted that she would do anything to protect him.

{¶ 25} Keeton testified that she was driven to the hospital by her cousin, Moore, and that Carmen also went with them to the hospital. In her testimony, she implied, at least, that Richmond did not accompany her to the hospital. Richmond's absence is more consistent with his having injured her than with her testimony that she was injured accidentally while in his presence.

{¶ 26} We conclude that this is not the rare case where the jury lost its way, resulting in a manifest miscarriage of justice. Richmond's First Assignment of Error is overruled.

### III.   Trial Counsel Was Not Ineffective.

{¶ 27} Richmond's Second Assignment of error is as follows:

{¶ 28} "APPELLANT WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT TO THE UNITED STATES

CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION."

### A.   The Test for Ineffective Assistance of Counsel.

{¶ 29} "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance."  *State v. Bradley* (1989) 42 Ohio St.3d 136, second paragraph of syllabus.

### B.   Counsel Was Not Ineffective During Voir Dire.

{¶ 30} Richmond first contends that his counsel's voir dire of the prospective jurors was inadequate, noting that it was only four pages in the transcript.   A defendant's voir dire is often much shorter than the State's, since it follows the State's voir dire, during which many of the points defense counsel may wish to cover have already been explored.   While defense counsel's voir dire was brief, counsel did engage five of the prospective jurors individually. We have read the voir dire, and we do not find it to have been ineffective.

{¶ 31} Richmond next points to two places where the trial court stopped his counsel during voir dire.   But these were actually instances in which his counsel was attempting to be more thorough – more effective – than the court would allow.   In the first instance, counsel attempted to ask one prospective juror: "In weighing the – in weighing the credibility of people, on a scale of one to ten, how much would – if you had two stories, how much would one side have to outweigh the other before you actually came to a decision as to which you believe?"   This would have been good to have known in assessing the prospective juror, but the court would not allow it.

{¶ 32} The second instance in which the trial court stopped counsel during voir dire

would have been potentially even more effective, had the court allowed it. Counsel attempted to elicit from the jurors themselves reasons why a defendant might choose not to testify in a case – i.e., reasons why a defendant might exercise the Fifth Amendment privilege against self-incrimination: "Now, I'm sure a lot of you have seen crime shows on TV and you've seen where the – sometimes the defendants choose not to testify. Can any of you give me any reasons why a defendant may choose not to testify in a case?" If the court had allowed this question, a prospective juror might have come up with an innocent explanation of why a defendant might elect not to testify, which would have constituted a validation of that innocent explanation by the jury, itself. Or, a prospective juror might have come up with an inculpatory reason – "he doesn't want to admit that he's guilty," for example. In that event, the juror's tendency to draw an adverse inference from the defendant's decision to exercise his privilege against self-incrimination would be exposed, and defense counsel could then innoculate the remaining jurors against that tendency, aided by the judge's instructions, and also consider keeping that particular juror off the jury.

{¶ 33} From the defense point of view, both of these questions were potentially useful. But the trial court wouldn't allow them. (In noting this, we are not indicating that the trial court erred in disallowing these questions.)

{¶ 34} Richmond next argues that his counsel was ineffective for not having discussed the presumption of innocence and the reasonable-doubt standard of proof. Both of these were covered in the trial court's instructions to the jury. It appears to have been defense counsel's strategy, in this "she said, she said" case where the conflict was between the victim's statements at the time and her in-court testimony, to argue that of course the jury should

believe the victim's testimony from the witness stand; i.e., that it wasn't even a close call. Making a great deal out of the reasonable-doubt standard of proof would have been somewhat inconsistent with that strategy. Relying heavily upon reasonable doubt essentially argues to the jury that although the evidence may preponderate against the defendant, it is not so clear as to justify a finding of guilt. That was not defense counsel's strategy in this case, and we cannot say that the strategy defense counsel followed was so unreasonable as to constitute ineffective assistance of counsel.

{¶ 35} Richmond next argues that his counsel was ineffective for not having exercised a peremptory challenge (he did not use his last peremptory) to keep a retired Cedarville police officer off the jury. The State had examined the retired officer, "Mr. W," at some length. It had elicited that he had been retired since 2001, that he had responded on more than one occasion to domestic violence calls, and that he could be fair and impartial in this case because: "It's all about the evidence."

{¶ 36} Defense counsel also addressed one question to Mr. W. Defense counsel had asked one prospective juror how he would determine the credibility of witnesses, and had elicited the response: "Well, you'd listen to what they said and if it made sense to my own experiences, or not, I kind of just used my common knowledge and common sense." Defense counsel then inquired of Mr. W: "Mr. [W], how would you go about that?," to which Mr. W responded: "Basically the same way, but on a – you know, you got to not read into what's being said."

{¶ 37} We were not there when Mr. W, the retired police officer, responded to the questions put to him. Defense counsel was. Defense counsel had the opportunity to look

Mr. W in the eye and assess him as a potential juror. Defense counsel may have concluded, from what he saw and heard, that despite Mr. W's background as a retired police officer, or perhaps because of that background, he would make a good juror from the defense point of view. Furthermore, when it came time to decide whether to exercise the defendant's last peremptory challenge, that decision had to be made in recognition that if Mr. W were excused, then someone else would move into the jury box, and yet another prospective juror would move into the position of alternate. Counsel may have made the judgment that these alternative prospects would be no better, or perhaps worse, from the defendant's point of view.

{¶ 38} There was clearly no basis for challenging Mr. W for cause. We cannot say, from this record, that defense counsel was ineffective for having failed to exercise a peremptory challenge against Mr. W.

### C. Defense Counsel Was Not Ineffective for Having Failed to Object to the Admission of the Victim's Out-of-Court Statements.

{¶ 39} The State elicited testimony from all five of its witnesses that Keeton told each of them, shortly after her injury, that Richmond hit her in the head with a cell phone, causing the injury. Richmond contends that his trial counsel was ineffective for having failed to object to this testimony as hearsay.

{¶ 40} Carmen, Moore, and Hanson testified that Keeton was "hysterical," "crying," "screaming," or "very upset," when she made the statement, shortly after the event, that Richmond had hit her in the head with a cell phone. Clearly, the testimony of each of these witnesses concerning Keeton's out-of-court statement would have been admissible under the

excited-utterance exception to hearsay in Evid. R. 803(2): "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

{¶ 41} Boedecker, the paramedic called to the scene, was there to provide any necessary medical attention. Keeton's statement to Boedecker was clearly admissible under Evid. R. 803(4): "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, *or the inception or general character of the cause* or external source thereof insofar as reasonably pertinent to diagnosis or treatment." (Emphasis added.)

{¶ 42} Cvitkovich, the police officer who responded to the scene, and evidently also to the hospital, was the last of these witnesses who received a statement from Keeton concerning the cause of her injury. It appears that by the time Keeton spoke to him, she had calmed down. His testimony concerning Keeton's out-of-court statement was the only testimony that might have been subject to a hearsay objection.

{¶ 43} Cvitkovich was also the last witness to testify on behalf of the State. By that time, the jury had heard four witnesses relate that Keeton had told each of them that Richmond had caused her injury by hitting her in the head with a cell phone. Interposing a hearsay objection would have been pointless. Furthermore, Keeton was going to testify on Richmond's behalf, which meant that her oral statement to Cvitkovich, as well as the written statement she gave him, would have been admissible to impeach her testimony, so the jury was going to hear it in any event.

{¶ 44} Richmond also contends that his trial counsel was ineffective for having failed

to object to the State's having used Keeton's written statement to impeach her testimony, during cross-examination. The written statement was never admitted in evidence, but the State showed it to her, and used it to impeach her testimony. A prior inconsistent statement may be used to impeach a witness. Evid. R. 801(D)(1). Richmond cites *State v. Justice* (1994), 92 Ohio App.3d 740, for the proposition that a prior inconsistent statement by a victim is not admissible to impeach the victim. But that decision did not involve impeachment. The statement was offered in the State's case-in-chief in that case, which the court of appeals found to have been erroneous, but harmless. Id., at 744, 747-748. Here, Keeton's prior inconsistent statement was properly used on cross-examination to impeach her testimony.

## D. Defense Counsel Was Not Ineffective for Having
## Failed to Object to the State's Closing Argument.

{¶ 45} According to Keeton's out-of-court statements, Richmond caused her injury by hitting her in the head with a cell phone. According to her in-court testimony, she fell and hit her head on a parking sign while they were both together in a K-Mart parking lot. By either account, Richmond was with Keeton – the mother of his child – when she was injured. The State argued to the jury that the fact that he did not accompany her to the hospital was more consistent with his having caused the injury than with the injury having occurred through no fault on his part. Keeton contends that his counsel should have objected to this argument upon the ground that there was no direct evidence of Richmond's whereabouts when Keeton went to the hospital.

{¶ 46} Carmen testified that he went with Moore and Keeton to the hospital. Keeton testified that Moore drove her to the hospital. In her direct testimony, Keeton was asked: "It

was only the two of you in the car?" She responded: "And Jerri Carmen." From this question and response, during Richmond's direct examination of Keeton, it is reasonable to conclude that Richmond did not go with her to the hospital. Thus, the factual predicate upon which this contention is predicated is groundless.

{¶ 47} We conclude that Richmond's trial counsel was not ineffective. His Second Assignment of Error is overruled.

**IV. The Trial Court Did Merge the Assault and Domestic Violence Convictions.**

{¶ 48} Richmond's Third Assignment of Error is as follows:

{¶ 49} "THE TRIAL COURT ERRED IN NOT MERGING THE CONVICTIONS OF ASSAULT AND DOMESTIC VIOLENCE."

{¶ 50} Richmond contends that because the offenses of which he was convicted were allied offenses of similar import, "these two offenses should not only merge for sentencing purposes, but should also merge for one conviction."

{¶ 51} A defendant may be "convicted" of multiple allied offenses of similar import – in the sense of having been adjudicated guilty of the multiple offenses – as long as he is sentenced upon only one of them. A "conviction" for R.C. 2941.25(A) purposes is an adjudication of guilt together with a sentence. *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, ¶ 24-26.

{¶ 52} In the case before us, Richmond was adjudicated guilty of both offenses, but the trial court specified, both at the sentencing hearing and in its sentencing entry, that the offenses merged for sentencing purposes. And, most importantly, only one sentence was imposed: a $500 fine and a 180-day jail sentence. Thus, we conclude that the trial court did

merge the convictions, and Richmond's assignment of error is not demonstrated in the record.

**{¶ 53}** Properly, the State should have elected upon which conviction Richmond was to be sentenced. *Whitfield*, supra, at ¶ 23-24. But Richmond does not assign as error the fact that this was not done. It is clear from the record that only one sentence was imposed. Although we overrule this assignment of error, we will remand this cause to the trial court for the limited purpose of obtaining and recognizing the State's election upon which of Richmond's two offenses his sentence has been imposed.

### V. Richmond's Sentence Is Not an Abuse of Discretion.

**{¶ 54}** Richmond's Fourth Assignment of Error is as follows:

**{¶ 55}** "THE TRIAL COURT ABUSED ITS DISCRETION IN SENTENCING APPELLANT TO A TERM OF SIX MONTHS."

**{¶ 56}** Richmond contends that the trial court did not consider the statutory purposes and principles of sentencing. He also contends that he received a maximum sentence "for going to trial and losing."

**{¶ 57}** The sentence was authorized by law. R.C. 2929.24(A)(1). At the sentencing hearing, the State made the following argument:

> I think that the Defendant in this case, your Honor, has a long history of irresponsible behavior. He also has a history of violent behavior. He has prior convictions for a domestic violence, prior convictions for assault, prior convictions for child endangering, prior convictions for vandalism, prior convictions for criminal damaging. There are multiple prior convictions.
>
> I think it's extremely unfortunate that the Defendant will miss significant events in his life; however, he's the one that made the decision that brought him here today. I also think that there is very little acknowledgment, in my opinion, that he did anything wrong. The only thing I heard today was he didn't want to go to jail. I fully expect the Defendant's behavior not to change – I see no pattern it's ever changed – in the future. Therefore, I would request that he be given the maximum penalty of six

months in jail rather than probation or any type of classes or counseling or anything along those lines. I personally feel that based upon his history that will do little to no good.

**{¶ 58}** The trial court then observed:

I have a CCH for Mr. Richmond. It appears that Mr. Richmond has a conviction for assault in 2000, a conviction for endangering children in 2003, a conviction for criminal damaging in 2006, a conviction for domestic violence in 2007, a conviction for disorderly conduct which was a reduction from telephone harassment in April 2010. It is the Court's opinion that even though the jury has convicted Mr. Richmond on assault and domestic violence, those two convictions do merge for sentencing purposes.

**{¶ 59}** Richmond cites R.C. 2929.21(A) and (B), which provide as follows:

(A) A court that sentences an offender for a misdemeanor or minor misdemeanor violation of any provision of the Revised Code, or of any municipal ordinance that is substantially similar to a misdemeanor or minor misdemeanor violation of a provision of the Revised Code, shall be guided by the overriding purposes of misdemeanor sentencing. The overriding purposes of misdemeanor sentencing are to protect the public from future crime by the offender and others and to punish the offender. To achieve those purposes, the sentencing court shall consider the impact of the offense upon the victim and the need for changing the offender's behavior, rehabilitating the offender, and making restitution to the victim of the offense, the public, or the victim and the public.

(B) A sentence imposed for a misdemeanor or minor misdemeanor violation of a Revised Code provision or for a violation of a municipal ordinance that is subject to division (A) of this section shall be reasonably calculated to achieve the two overriding purposes of misdemeanor sentencing set forth in division (A) of this section, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar offenses committed by similar offenders.

**{¶ 60}** By considering Richmond's history of violent offenses, the trial court was considering the need for changing Richmond's behavior, as well as the need to protect the public from future criminal acts. We have looked at the two photographs of the victim, after her injury, which were received in evidence. They portray a significant gash to her forehead,

which had evidently produced a fair amount of blood before having been cleaned up.   At least one witness, Moore, referred to "blood all over her face."   The injury, while not life-threatening or disabling, was not trivial, either.   We conclude that the sentence was not excessive.

{¶ 61} Finally, Richmond argues that because the trial court had expressed its willingness to accept a plea bargain and sentencing agreement that would include a suspended jail sentence, the trial court was effectively imposing an enhanced sentence in retaliation for Richmond's having rejected an offered plea bargain.   Richmond cites *State v. Warren*, (1998), 125 Ohio App.3d 298, and *State v. Scalf* (1998), 126 Ohio App.3d 614, in support of his contention.   In each of those cases, the trial court made remarks that could lead to the conclusion that a harsher sentence was being imposed in retaliation – i.e., as punishment – for the defendant's having rejected an offered plea bargain.   *Warren*, 125 Ohio App.3d at 307, *Scalf*, 126 Ohio App.3d at 622-623.

{¶ 62} In *State v. Warren*, supra, the court of appeals distinguished between a trial court's encouraging a guilty plea by imposing a lesser sentence upon a defendant who pleads guilty than the defendant would have received upon conviction after trial – which is permissible, and punishing a defendant for exercising the right to go to trial – which is impermissible.   Id., at 306-307.   It is admittedly a fine line.   Essentially, if the sentence imposed for criminal conduct upon conviction after the rejection of a plea bargain and trial is greater than the sentence that would have been imposed for the exact same criminal conduct upon conviction after trial if no plea bargain had ever been offered, then the sentence is punishing a defendant for his decision to stand trial, and that is impermissible.   But if the

sentence imposed for criminal conduct upon conviction after the rejection of a plea bargain and trial is the same as the sentence that would have been imposed (or at least no greater than the sentence that would have been imposed) for the exact same criminal conduct upon conviction after trial if no plea bargain had ever been offered, then the defendant is not being punished for his decision to stand trial, and that is permissible.

{¶ 63} In the case before us, there are no remarks in the record to suggest that the trial court was retaliating against Richmond for his having rejected the plea bargain offered by the State. In most plea bargains, the State will offer some inducement to obtain a guilty plea. In this case, the State had the obvious problem that the victim, who was the only eyewitness, had recanted her statements incriminating Richmond, and was going to testify in his defense. That gave the State a powerful incentive to offer a substantial concession to Richmond in an effort to induce him to plead guilty. By electing to decline the plea offer and go to trial, Richmond lost the benefit that he could have obtained from having accepted the plea offer. On the other hand, the only way Richmond could have obtained an acquittal was by going to trial. This involved an analysis of the risk of going to trial that is necessarily present in any plea negotiation.

{¶ 64} Richmond's Fourth Assignment of Error is overruled.

## VI. Conclusion.

{¶ 65} All of Richmond's assignments of error having been overruled, the judgment of the trial court is Affirmed. Because the State did not elect, and the trial court did not recognize, upon which of Richmond's two convictions the sentence was imposed, this cause is Remanded to the trial court for the making of that election.

. . . . . . . . . . . . .

FROELICH and HALL, JJ., concur.


Copies mailed to:

Ronald Lewis
David R. Miles
Hon. Michael K. Murry